SMITH v. ÆTNA LIFE INS. CO.—147 S. W. (2d) 1058.

Western Section. Nov. 15, 1940.

Certiorari denied by Supreme Court February 15, 1941.

Costen & Crabtree and Robt. B. Goodwin, all of Memphis, for appellant.

Albert F. Johns, Walter P. Armstrong, and Thomas C. Farnsworth, all of Memphis, for appellee.

KETCHUM, J.   Mrs. Smith sued the Insurance Company in this case to recover on the double indemnity provision for accidental death contained in a life insurance policy on the life of her husband, William Calvin Smith.   The insured died on the 15th day of March, 1939, while the policy was in force, and the insurance company paid the complainant the sum of $10,000, the amount due on the life policy, but denied liability under the double indemnity provision which provided for the payment of a like amount if the death of the insured resulted "directly and independently of all other causes from bodily injuries effected solely through external, violent and accidental means," etc.

The bill alleged that a few days before March 15, 1939, the insured contracted a severe head cold, and that in the treatment of this cold and the clearing of his nose the inside wall of his nostril became lacerated or scratched, and that a boil or other infection set in through this open wound and was carried into the blood stream and caused his death, and that his death was caused by accidental means within the meaning of the double indemnity clause of the policy.

The case was heard by the chancellor and a jury on the testimony of the complainant and the two physicians who treated the insured

during his illness, and at the close of the proof the chancellor sustained a motion of the defendant to withdraw the issues from the jury and dismissed the bill; and the complainant's motion for a new trial having been overruled, she has appealed to this court.

The complainant testified that her husband developed a severe head cold about the last of February, and that he was constantly blowing and wiping his nose with his handkerchief for about a week; that on Monday night, March 6th, he complained of a soreness in his nose, and that he continued to complain of this soreness, and that she looked at it on Wednesday night and saw "a little raw, very red, wet spot;" that it "looked sort of like a little nick in the skin" which was redder than the rest of his nose. She located this spot as being just on the inside of the outer wall of the right nostril. It was not swollen at that time, but swelling had begun the next day and Dr. Stinson was called. This was on March 9th. Dr. Stinson says he then had temperature of 101 3/5 and complained of general body aches and pains, especially in the chest. As this was not his specialty, he asked that Dr. Colbert be called. There was at this time a definite swelling in the nose, but the boil was well localized, or coming to a head, and no treatment was given it at that time.

On the following day the insured seemed to be better and had but little fever. Dr. Colbert had strapped his chest and he had been relieved of pain in that region. On Saturday Dr. Stinson observed that there was some extension of the boil, and that the inflammation and infection were spreading. This infection continued to spread from day to day, his face and eye became swollen and inflamed, and on Monday evening he was taken to the hospital and Dr. Rychener and Dr. Semmes were also called in consultation. A lumbar puncture was made and a test of the fluid drawn from the spine showed staphylococcic germs present. Death ensued as the result of meningitis produced by these staphylococcic germs. The staphylococcus is a pyogenic or pus forming germ, and in the opinion of the physicians, had its origin in this instance in the boil in the nose.

The staphylococcus is a microscopical organism which is always present in the skin and is harbored in the mouth, about the teeth, and in the nasal passages. Boils or furuncles, are always formed on external surfaces of the body where there is hair, usually in the hair follicles or that part of the skin from which the hair emerges. There must, however, be some lesion or abrasion, or break in the skin, to afford a port of entry for the staphylococcic germ. Dr. Stinson, after having testified that boils are always found on some external surface of the body where there is hair, in reply to a question as to their origin or cause testified that the generally accepted opinion is that it is the staphylococcus on the skin that invades the root of the hair, and the gland that supplies that root; but that there must be some break in the skin, as the germ would not go through the un-

broken skin; and that "there is always some injury, from the pulling of a hair, or squeezing, or pricking, or something like that that produces a lesion." And he stated that the constant blowing and rubbing of the nose when you have a bad cold might break the mucous membrane in the nose, and frequently did cause it to become raw and irritated; and that this might afford a port of entry for the staphylococcus germ.

Dr. Colbert also testified that boils or furuncles usually start in hair follicles, that part of the skin from which the hair emerges; that there had to be some break in the continuity of the skin, like forcibly pulling a hair out, which would afford a place for the staphylococcus germ to enter; and that the constant rubbing of the nose with a handkerchief during a severe cold might cause a break in the mucous membrane and afford a port of entry for streptococcic or staphylococcic germs, and that he had known of boils forming in the nose as the result of head colds, but he would not say this was a common occurrence.

The undisputed proof in this case warrants the conclusion that the constant blowing and wiping of his nose by the insured caused the nose to become so raw and irritated as to afford a port of entry for the staphylococcic germ, and that this caused the boil to form; and that the infection spread until the germ got into the bloodstream causing the meningitis which resulted in death.

There is no evidence that the insured intentionally pulled a hair from his nostril, or that he intentionally pricked or cut the skin; on the other hand, there is no evidence that the nick or cut in the skin was the result of any mishap or mischance or accidental cause. The testimony of both the doctors is that the voluntary act of constantly blowing and rubbing the nose during a severe head cold is sufficient to, and frequently does, cause the nose to become raw and irritated; and that this would make a sufficient opening for the germ to enter.

█ The courts generally hold that death or injury does not result from accident or accidental means within the terms of an accident policy where it is the natural result of the insured's voluntary act, unaccompanied by anything unforeseen, except the death or injury. There are some courts, however, which hold that the death or injury is by accidental means and that recovery may be had, where something unforeseen or unexpected occurrs which produces the death or injury, although the act preceding it is the intentional act of the insured. The majority of the courts, however, including those of this state, hold that the means are not accidental, and that there can be no recovery, where the death or injury is the result of the voluntary or intentional act of the insured, even where the result is unforeseen or unexpected, in the absence of some mishap or mischance or slip in the doing of the act itself. See 29 Am. Jur., Title "Insurance," sec. 941, and cases there cited.

The Tennessee cases so holding are Stone v. Fidelity & Casualty Co., 133 Tenn., 672, 182 S. W., 252, L. R. A., 1916D, 536, Ann.

Cas., 1917A, 86; Ramsey v. Fidelity & Casualty Co., 143 Tenn., 42, 223 S. W., 841, 13 A. L. R., 651; McFarland v. Massachusetts Bonding & Insurance Co., 157 Tenn., 254, 8 S. W. (2d) 369, 64 A. L. R., 962; Id., on second appeal, in 160 Tenn., 546, 26 S. W. (2d), 159; Hahn v. Home Life Insurance Co., 169 Tenn., 232, 84 S. W. (2d), 361; Scott v. Metropolitan Life Ins. Co., 169 Tenn., 351, 353, 87 S. W. (2d) 1011; Provident Life & Accident Ins. Co. v. Wallace, 23 Tenn. App. 697, 137 S. W. (2d) 888; and Travelers Ins. Co. v. Ansley, 22 Tenn. App., 456, 124 S. W. (2d), 37.

In Stone v. Fidelity & Casualty Co., supra, it was said at page 675 of 133 Tenn., at page 252 of 182 S. W., L. R. A., 1916D, 536, Ann. Cas., 1917A, 86:

"The general rule is that an injury is not produced by accidental means, within the meaning of this policy, where the injury is the natural result of an act or acts in which the insured intentionally engages. A person may do certain acts the result of which produces unforeseen consequences resulting in what is termed an accident; yet it does not come within the terms of this contract. The policy does not insure against an injury that may be caused by a voluntary, natural, ordinary movement, executed exactly as was intended.

"Therefore, to determine the matter, we look, not to the result merely, but to the means producing the result. It is not sufficient that the injury be unusual and unexpected, but the cause itself must have been unexpected and accidental."

In the Ramsey case, 143 Tenn., at page 52, 223 S. W., 841, at page 843, 13 A. L. R., 651, the court cited with approval the case of Maryland Casualty Co. v. Spitz, 3 Cir., 246 F., 817, 159 C. C. A., 119, L. R. A., 1918C, 1191. In that case the insured, having a boil on his neck, rubbed it while his hands were soiled with blood and other substances, for the purpose of relieving an itchiness, thereby breaking the scab and permitting germs of erysipelas to enter. The court held that his death from erysipelas did not result from accidental means, as the breaking of the scab was a probable result, and one reasonably to be expected from his intentional act. The court said: "As we read the testimony, nothing appears to show that the injury was inflicted by accidental means. The deceased rubbed or scratched his neck in the ordinary way; there is no evidence that he was disturbed or interfered with during the operation, and an ordinary and not unusual result followed; that is, he broke the scab. His hands were not clean; but he knew that fact, and must be held to the risk of such harm as might follow therefrom. In a word, he seems to have done just what he intended to do, namely, rub or scratch his neck to relieve the itching, and in our opinion breaking the scab during the process was a probable result, one reasonably to be expected. We think the defendant was entitled to binding instructions."

The facts in the Spitz case are not materially different from those in the instant case. The constant blowing and wiping of his nose by the insured was his voluntary act, and it was the ordinary and natural result of such an operation that his nose should become raw and irritated. The testimony of both the doctors is that this frequently happens in such cases. There is no evidence of any slip or mishap in blowing or wiping his nose which caused it to become raw and the means of admitting the staphylococcic germs into the circulatory system. It cannot, therefore, be said that the infection was the result of accidental means. In the McFarland case, supra, it is said, at page 257 of 157 Tenn., at page 370, of 8 S. W. (2d) 64, A. L. R., 962: "Undoubtedly the rule is that the *means* must be accidental."

This is not in conflict with the holding in the Hahn and Ansley cases, supra. In the Hahn case the insured died of ptomaine poisoning as the result of eating tainted sausage which he believed to be good. As noted in Scott v. Metropolitan Life Ins. Co., supra, the "tainted food was the means of death. The intention of the insured was to eat wholesome food. His eating poison food was accidental."

In the Ansley case the death of the insured resulted from the taking of an overdose of a medicine which he had been accustomed to take to quiet his nerves. It is true that he took the medicine that he intended to take, and probably in precisely the quantity intended, but he did so in the belief based upon his previous experience that he was taking a harmless nerve remedy. His ignorance that it was poisonous in the quantity taken rendered the means of death accidental within the meaning of the policy provision. And it was said [22 Tenn. App., 456, 124 S. W. (2d), 41]: "It may be observed that the cases generally hold that death or injury results from accidental means when it is caused by taking poison by mistake or by taking an overdose by mistake." (Citing cases.)

Counsel for appellant say that it would be a reasonable deduction from the proof to find (1) that a grain of sand or a flake of tobacco in the pocket of the insured might have become attached to his handkerchief, and caused the nick or split in the tender skin of his nose when he wiped it with his handkerchief; or (2) that his handkerchief had been stiffly laundered, and that the edge of it cut the tender skin of the nostril; or (3) that the insured's hand slipped causing his finger nail to inflict the injury; and that either of these findings would warrant the conclusion that the nick was caused by accidental means. The difficulty is that this would be basing a judgment upon pure conjecture, as there is no evidence in the record upon which such a finding could be based. The testimony of the complainant is that the insured was constantly blowing and wiping his nose for a week before he complained of the soreness; and the two physicians testifying in her behalf stated that it was the "ordinary and natural result" of

such an operation that the nose should become raw and irritated, and that this frequently happened in such cases; and Dr. Colbert testified that a sneeze might cause a break in the mucous membrane and afford a port of entry for the germ.

We find no evidence in the record which would warrant the conclusion that the infection was the result of accidental means, and the assignments of error complaining of the action of the chancellor in withdrawing the issues from the jury must be overruled.

Appellant also assigns error upon the action of the court in declining to permit the complainant to testify as to the habit and custom of the deceased with reference to pulling or cutting the hairs in his nose. The assignment will have to be overruled because it does not appear from the record what the answer of the witness would have been if she had been permitted to answer.

The question was evidently not deemed important as, when objection was made to it, counsel for complainant said: "I merely wish to show that it was not his habit to pull hairs from his nose; His habit was to clip them. I don't think it has any particular bearing."

Under our practice when evidence is excluded it is necessary to show either by the answer of the witness, or by stipulation, what the testimony would be, and a mere statement of counsel as to what he wished to show is not sufficient. In Stacker v. Louisville R. R., 106 Tenn., 450, 61 S. W., 766, it is said by the court: "It is true that counsel, in making his exceptions, said that he expected the witness to state further facts, but whether the witness would have met these expectations . . . does not appear."

Assignment overruled.

We find no error in the decree of the chancellor, and it is affirmed at the cost of appellant and her sureties on the cost and appeal bonds.

Senter and Anderson, JJ., concur.